## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | |
|---|---|
| KELLY LOGERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:13-CV-20-JAR |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Kelly S. Logerman's ("Logerman") application for

disability insurance benefits under Title II of the Social Security Act and Supplemental Security

Income (SSI) payments, alleging a disability beginning March 1, 2008. (Tr. 34.) Logerman

alleges disability due to low back pain and depression. (Tr. 38-39).

## **I.      Background**

On March 31, 2008, Logerman completed her application for disability insurance and SSI

benefits. (Tr. 34). The state agency denied Logerman's claim initially. (Tr. 107-08). Following

a hearing, Administrative Law Judge (ALJ) Larry Shepherd issued a decision on March 24,

2010, finding that Logerman was not under a disability. (Tr. 110-23). On May 13, 2011, the

Appeals Council remanded the case to the ALJ for further consideration of the medical opinion

evidence. (Tr. 127-29). After conducting a new hearing on January 20, 2012, ALJ Dennis

LeBlanc (hereinafter "the ALJ") issued a written decision on January 31, 2012, upholding the

denial of benefits. (Tr. 14-26). Logerman requested a review of the ALJ's decision by the Appeals Council. On March 12, 2012, Logerman's counsel submitted additional materials for the Appeals Council's review. (Tr. 9-10). On January 16, 2013, the Appeals Council denied Logerman's request for review. (Tr. 1-3). The decision of the ALJ thus stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000). Logerman filed this appeal on March 7, 2013. (ECF No. 1.) The Commissioner filed an Answer. (ECF No. 9). Logerman filed a Brief in Support of her Complaint. (ECF No. 15). The Commissioner filed a Brief in Support of the Answer. (ECF No. 22). Logerman did not file a reply brief in support of her Complaint, but the time for filing such a reply has run. See Case Management Order, ECF No. 4.

## II.    Decision of the ALJ

The ALJ determined that Logerman met the insured status of the Social Security Act through September 30, 2010. (Tr. 17). The ALJ decided that Logerman has not engaged in substantial gainful activity since March 1, 2008, the alleged onset date. (Tr. 17). The ALJ found that Logerman has the following severe impairments: degenerative disk disease, asthma, obesity, major depressive disorder, and generalized anxiety disorder. (Tr. 17). The ALJ stated that Logerman, however, did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations. (Tr. 17-19). The ALJ finally determined that Logerman had the residual functional capacity ("RFC") to perform light work as defined in the regulations, except claimant was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently; is limited to walking no more than two hours out of an eight-hour workday; must be able to alternate between sitting and standing at will; is limited to climbing ramps or stairs for only up to two hours out of an eight-

2

hour workday, but never ladders, ropes, or scaffolds; is limited to occasional balancing, stooping, kneeling, crouching, and crawling; is limited to handling and reaching frequently; must avoid work environments containing hazards such as dangerous machinery or unprotected heights; is able to understand, remember, and carry out non-detailed two-to-three step instructions; is able to perform repetitive tasks in an routine work setting involving few changes, where interaction with supervisors and coworkers would occur no more than an occasional basis, and where work is performed in a nonpublic setting; and is not able to perform work where she is required to communicate with the public on behalf of the employer. (Tr. 19-24). The ALJ determined that Logerman was unable to perform any past relevant work because all of her past relevant work exceeded her RFC. (Tr. 25). The ALJ found that, considering Logerman's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform, such as an assembler or a packager. (Tr. 25-26). In conclusion, the ALJ found that Logerman was not disabled, as defined under the Social Security Act, from March 1, 2008 through the date of the decision.

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

#### 1. Logerman's Testimony

Logerman testified on January 20, 2012 as follows.

Logerman recently moved to give her children, aged 13 and 11, a better living environment. (Tr. 39-40). She moved into an apartment unit on the ground floor. (Tr. 39-40). Logerman is 37 years old. (Tr. 40). She has a high school diploma and a CNA license, but the license is no longer current. (Tr. 40). She last worked as a CNA in 1997. (Tr. 40-41). She last

3

worked at Brookstone's warehouse in Mexico as a packer in 2007. (Tr. 41-42). She would pack the merchandise and put it on a conveyor belt. (Tr. 41). She was a part-time seasonal worker, working 8-10 hours a day. (Tr. 42). She was on her feet all day, except for approximately one hour. (Tr. 43). She worked there about 3 months, but she had to stop because her legs and back hurt. (Tr. 42). She was laid off but never recalled. (Tr. 42). She sometimes had to call in sick to work because of problems she had. (Tr. 43). One morning she had back problems, such that she could not even sit up. (Tr. 43.)

Logerman filed for Social Security benefits within a month after being laid off from Brookstone. (Tr. 43). She filed for unemployment benefits but she is not sure if she received them. (Tr. 43). She has applied for a secretary job but does not believe that she could do it because of her depression and her back. (Tr. 44). She has not applied for any jobs for the last five months. (Tr. 44).

Logerman has not worked for four years and only applied for a secretary job. (Tr. 45). She has not applied for other jobs because the only employment in her area is factory or fast food restaurants. (Tr. 45). She cannot perform those kinds of jobs because she gets really nervous and cannot provide good customer service. (Tr. 45). She could not be a packer at a factory because of the lifting and standing on her feet. (Tr. 46). Within the last 2-3 years she stopped being able to stand on her feet for 8 hours, with short breaks, like she did at Brookstone. (Tr. 46-47).

Since March 2008, Logerman has supported herself through temporary assistance for needy families (TANF) payments she receives for her children. (Tr. 47). Her kids ride the bus to school. (Tr. 47-48). Logerman never drives them to school. (Tr. 48). She has a license but does not currently have a vehicle. (Tr. 48). A friend drove Logerman to today's hearing. (Tr. 48). She has approximately seven (7) friends, but she does not see them very often. (Tr. 48).

4

Her friends come over to her house, where they sit and talk. (Tr. 48). No one comes over to help her with the chores at her house. Her kids do all the chores around the house. (Tr. 48). She does laundry while they are at school. (Tr. 49). She is able to move the clothes from the washer to the dryer. (Tr. 49). There are no chores around the house that she is physically or mentally unable to do. (Tr. 50).

During the day, she sits on her couch and watches TV or listens to the radio. (Tr. 50). The TV is on for about 5 hours a day. (Tr. 50). She listens to the radio for about an hour a day. (Tr. 51). She does not read. (Tr. 51). She does not have a computer. (Tr. 51). She has a cell phone and sends text messages to her mother and sister. (Tr. 51). Her mother and sister live nearby and come to her house around once a week. (Tr. 51). In the last 4 years, she leaves her house to go to the doctor, the store, or to her mom's house. (Tr. 52-54). She does not go to her kids' schools except for the teacher conference at the beginning of the year. (Tr. 54). She goes to the kids' games during the summer. (Tr. 55). She has not left the state since filing for disability. (Tr. 55).

Logerman has her mom pick her up or she calls a cab when she needs to leave the house. (Tr. 55). She has problems out in public because she gets nervous. (Tr. 55). She has trouble dealing with strangers because she thinks they are being sarcastic. (Tr. 56). She has some conversations with strangers when she goes to the store. (Tr. 56).

Logerman has pain in her lower back that travels down her leg. (Tr. 56). The pain comes and goes if she takes her medicine. (Tr. 57). It goes away about 30 minutes after she takes her medicine. (Tr. 57). Standing on her feet more than 10 minutes, walking and sitting make the pain worse. (Tr. 57). Her pain medication is prescribed by her doctor. (Tr. 57). A heating pad also helps relieve the pain. (Tr. 58). She had back surgery in March 2011 and for 2-3 weeks

5

thereafter she was pain free, but the pain slowly came back. (Tr. 58). She had injections on her back in the past, but they did not help. (Tr. 58).

Logerman's back problems became worse in 2006, when she was working at Brookstone. (Tr. 59). It has been about the same since then. (Tr. 60). The pain medication makes her drowsy. (Tr. 60). She also has pain in her hips and shoulders. (Tr. 60). She has arthritis. (Tr. 60-61). She takes medication once a week. (Tr. 61). The pain in her hips is light compared to the pain in her back. (Tr. 61). She just started having problems with her shoulders in the last two years. (Tr. 61). She has pain all through her shoulder blades. Tr. 61). Walking long distances hurts her hips. She can only walk half a city block. (Tr. 62).

Logerman has taken medication for depression, anxiety and post-traumatic stress disorder for about 2 years. (Tr. 61). The medication helps. (Tr. 62-63). She had problems with depression and anxiety when she was working but was not seeing a doctor at that time. (Tr. 63). She was taking Elavil when she was working. (Tr. 3). Her depression and anxiety is much worse than when she was working. (Tr. 63).

She sleeps around 3-4 hours a night. (Tr. 64). As a result, she falls asleep during the day. (Tr. 64). Three to four times a day she has problems with crying. (Tr. 64). She starts crying when she has flashbacks to when she was abused as a child. (Tr. 64-65). After she has a flash-back, Logerman gets very anxious, is hyper vigilant, and her mind races. (Tr. 65-66). She thinks people are talking about her. (Tr. 66-67). She might have to have another back surgery to fuse her vertebrae together. (Tr. 67-68). About three times a week it is hard for Logerman to get up and face her day. (Tr. 68). She talks to the people at the Arthur Center about this. (Tr. 68-69). She goes to the Arthur Center every two weeks. (Tr. 69).

Logerman used to play Bingo, but has not played in three years. (Tr. 69).

6

### 2. Vocational Expert Gary Weimholt

Mr. Weimholt considered the following hypotheticals.

In the first hypothetical, the individual was 37 years old, with a high school education, was able to lift and/or carry 20 pounds occasionally, 10 pounds frequently, could walk for two hours of an eight-hour work day, would need to alternate between sitting and standing throughout the work day and would be able to do so at will. The individual could climb ramps and stairs for two hours of an eight-hour work day, but no ladders, ropes or scaffolds. The individual could occasionally balance, stoop, kneel, crouch, and crawl. The individual would be able to frequently reach and handle, but avoid work environments containing hazards such as dangerous machinery or unprotected heights. The individual would be able to understand, remember and carry out non-detailed two-to-three-step instructions, perform repetitive tasks in a routine work setting involving few changes, where interaction with supervisors and co-workers would occur no more than on an occasional basis, meaning no more than one-third of the entire work day, where work is performed in a non-public setting, and where the hypothetical individual would not be required to communicate with the public on behalf of the employer. (Tr. 71.)

Mr. Weimholt testified that Logerman would not be able to perform any of her past relevant work as it is generally performed in the national economy. (Tr. 72-73). However, she would be able to perform the work of inspection and hand packaging jobs, code 559.687-074, with the alternative sitting and standing provision included, and she could perform the work of assembler of small products, code 739.687-030. These jobs are light exertional levels. (Tr. 74).

In the second hypothetical, Mr. Weimholt was to assume all of the information from the first question, but that the individual would be off task, unable to perform her work, for periods

7

of approximately 20 percent of the work day. (Tr. 74). Mr. Weimholt said that such a person would not be employable in these occupations. (Tr. 74). Upon inquiry by Logerman's counsel, Mr. Weimholt also said that the individual would not be employable if she missed work two to three days a week. (Tr. 75).

## B. Medical Records

Logerman's relevant medical records are summarized as follows:

Logerman was seen at the Arthur Center from May 1, 2007 through September 21, 2010. She was diagnosed with major depressive disorder (recurrent and moderate) and a GAF of 50.[1] (Tr. 337). Logerman was followed at Mexico Family Health Care from May 31, 2006 through March 11, 2008.

On January 28, 2008, Logerman was seen at Medical Family Health Care, complaining of back and hip pain. Logerman stated that she had been having pain in her hip and low back for at least a year. She was a smoker. Dr. Justin Jones gave Logerman a prescription for Naproxen and instructed her to use Tylenol for pain. (Tr. 341).

On February 26, 2008, Logerman was seen by Dr. Bradley Sloan at the Center of Orthopedic Excellence for L-spine pain and hip pain. She reported that the pain was currently 8 out of 10 and had a sharp quality. She denied depression and agitation. Her mood and affect were normal. Dr. Sloan diagnosed her with lumbar spine pain, bilateral trochanteric bursitis, bilateral joint pain in her hip, and obesity. Logerman received steroid injections in her hip. (Tr. 362-366).

---

[1] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV 32.

8

On March 11, 2008, Logerman was seen by Dr. Jones to review her cholesterol labs and with complaints of "some anxiety, some depression, some insomnia" and because she is frustrated about being overweight. She declined counseling for her anxiety, depression and insomnia. Dr. Jones prescribed Paxil and Klonopin for her mental health issues. (Tr. 339-40).

Logerman was seen at Healthworks for her lumbar spine from April 14, 2008 through May 2, 2008. On April 14, 2008, physical therapist Jennifer Buswell saw Logerman, who rated her pain as a 9. Logerman stated that she had not had any surgeries for this condition and was not taking any prescription for this condition. (Tr. 377). Logerman reported that she had an MRI at Audrain Medical Center, which was positive for 3 bulging discs in her lumbar spine. (Tr. 378). Logerman also reported that she frequently wakes with muscle spasms in her back and leg.

Logerman was seen at Mexico Health Services from October 3, 2008 through July 17, 2012. On October 3, 2008, Dr. R.W. Jackson found that Logerman was experiencing chronic low back pain with sacroilitis that was worse on the right. (Tr. 428-29). Her sacrum and coccyx were normal. Dr. Jackson prescribed Toradol, Norflex for pain relief; Methotrexate for arthritis; Mobic; and Cymbalta.

On October 23, 2008, Logerman underwent a psychological evaluation by Patrick Finder, Licensed Psychologist. (Tr. 403-08, 440-46). Logerman reported physical and sexual abuse by her father, physical abuse by her first husband, and problems with being around people. She stated that she had "pretty constant suicidal thoughts." He diagnosed her with major depression (recurrent, severe), post-traumatic stress disorder, panic attacks with agoraphobia. (Tr. 445). He assigned her a GAF of 50.

On November 7, 2008, Logerman was seen by Dr. Jackson. He reported that her pain level was down to a 2/10 and her HEENT (head, ears, eyes, nose, throat) examination was

9

unremarkable. Her exam revealed some low back stiffness but to a much lesser degre · as compared with her first evaluation. She reported 85% relief from her low back symptoms. He gave her Norflex and Toradol injections for continued back pain relief, and refilled her methotrexate and Cymbalta. (Tr. 430).

On December 19, 2008, Dr. Jackson saw Logerman for a follow up for her spondylitis. (Tr. 431). Dr. Jackson reported that Logerman continued to do "quite well" on Methotrexate therapy with "remarkable improvement and relief in low back pain." Dr. Jackson stated that "[f]or the holidays, we will go ahead and give her Toradol 60 mg IM and Norflex 60 mg IM so she can keep up pace with the family responsibilities and activities."

On January 22, 2009, Dr. Jackson saw Logerman for her spondylitis, noting she had a flare-up for discomfort in her low back. (Tr. 432). Dr. Jackson again gave her Norflex and Toradol injections and refilled her Methotrexate and Mobic.

On February 20, 2009, Logerman was seen by Dr. Daniel Lamthe-Jost at the Mexico Health Services. (Tr. 433). Logerman reported pain that was a 8 out of 10, mainly in her low back.

On February 24, 2009, Logerman was seen at Audrain Medical Center by Dr. Jeffrey Tiede. (Tr. 409-16). Dr. Tiede noted that the severity of the pain varied from a 5-8 out of 10. Dr. Tiede reviewed an MRI that showed "some degeneration at the S-1 level with mild foraminal compression." Dr. Tiede gave Logerman a right sacroiliac joint steroid injection. (Tr. 412).

On March 20, 2009, Logerman had imaging done at Audrain Medical Center for evaluation of her low back pain. (Tr. 436). Dr. George Cyriac had the following impressions: 1) no evidence of significant abnormalities of the sacroiliac joints except early degenerative joint

10

disease; 2) diffusely bulging L5-S1 disc; and 3) there is foraminal narrowing bilaterally at the L5-S1 level which is more prominent on the right than the left.

On April 21, 2009, Dr. Tiede performed a L5-S1 lumbar epidural steroid injection. (Tr. 417-27).

Logerman was seen at the Arthur Center on May 17, 2010. (Tr. 452-58). She was diagnosed with major depressive disorder (recurrent, moderate), and assigned a GAF of 50.

On April 30, 2010, Logerman was seen by Dr. Jackson at Audrain Medical Center. (Tr. 485-86). She was prescribed Toradol for immediate pain relief and ordered for an evaluation in the pain clinic with Dr. Tiede.

On October 29, 2010, Logerman had an appointment with Dr. Jackson at Audrain Medical Center. (Tr. 487-88). Logerman reported no enduring benefit from her lumbar epidural steroid injections and back injections. She was prescribed Toradol, Noraflex and Cymbalta.

On March 23, 2011, Logerman underwent a microdisketomy L5-S1, right, at Columbia Regional Medical Center. (Tr. 470-76).

On April 5, 2011, Logerman had an appointment at Mexico Health Services. (Tr. 466). It was noted that she was last seen in the summer of 2010. Logerman reported that she had been doing better on Cymbalta but that lately her mood was more depressed and irritable. Logerman rated her depression as a 8 on a scale of 10. She was assigned a GAF of 52.

On September 23, 201, Logerman was seen for a follow-up appointment at Audrain Medical Center after her microdiskectomy on March 23, 2011. (Tr. 492-94). Logerman reported that she was "feeling great" for two months but has been having a reoccurrence of low back pain since the middle of June. (Tr. 492). She reported that she had not been back to her spine surgeon because she has been taking care of her mother and aunt.

On November 25, 2011, Logerman was seen at Mexico Health Services. (Tr. 498). She was diagnosed with major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and cluster B traits. (Tr. 498). It was recommended that therapy be restarted.

On January 9, 2012, Logerman appeared for a psychiatric evaluation with Dr. Melissa Hutchens at the request of her attorney. (Tr. 502-510). Dr. Hutchens reported that Logerman had symptoms of major depressive disorder (recurrent, severe), post-traumatic stress disorder, history of learning disabilities, chronic pain. Dr. Hutchens assigned Logerman a GAF of 41 "due to her serious impairments in social and occupational functioning as well as major impairment in family relationships and mood." Dr. Hutchens stated that "[d]ue to the severity of the above symptoms related to Ms. Logerman's anxiety and depression, it would be very difficult for her to find or maintain gainful employment." (Tr. 509).

On January 9, 2014, Dr. Hutchens completed a Medical Assessment of Ability to do Work-Related Activities (Mental). (Tr. 513-14). Dr. Hutchens found that Logerman had no useful ability to function in every area except her ability to understand, remember, and carry out simple job instructions and maintain personal appearance, in which Logerman was "seriously limited but not precluded."

On May 1, 2011, Logerman was seen at Mexico Health Services. (Tr. 523). She was diagnosed with bipolar type II, generalized anxiety disorder, post-traumatic stress disorder, and borderline personality disorder.

**IV. Legal Standard**

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is

12

determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." Id. "The sequential evaluation process mav be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008); see also Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." Mueller v. Astrue, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

13

assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. Id.; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. Id.; see also 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." Goff, 421 F.3d at 790; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id.; see also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. See Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002); see also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

[t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. Krogmeier, 294 F.3d at 1022.

## V.    Discussion

Logerman contends that the ALJ's RFC finding was not supported by any medical evidence and, therefore, the decision to deny Logerman's claim was not supported by substantial evidence on the whole record. (ECF No. 15 at 23-27). Logerman notes that the ALJ granted the opinion of psychologist Finder's opinion "less than substantial weight." The ALJ asserted that Finder's conclusion that Logerman had severe psychologically based symptoms that would seriously interfere with social, occupational, or school functioning was not consistent with other psychiatric records in evidence, particularly given Logerman's sporadic treatment history and activities of daily living. (Tr. 23). The ALJ also criticized Finder's report for relying "quite heavily" on the subjective report of symptoms and limitations provided by Logerman. (Tr. 23). Logerman also asserts that the ALJ give little weight to the opinion of Dr. Hutchens that Logerman would have a difficult time finding or maintaining gainful employment and "could not

15

be relied upon to act in an emotionally stable manner or to interact with others in a socially appropriate matter." (Tr. 23-24.) Logerman argues that the ALJ did not explain why her daily activities were inconsistent with the psychological limitations noted by Finder and Dr. Hutchens. (ECF No. 14 at 24). Logerman contends that the ALJ did not point to any mental health professional that either examined or reviewed the record of her treatment and concluded that Logerman "could perform the simple work described by the ALJ in his finding of RFC." (ECF No. 15 at 24-25). Logerman also insists that the ALJ was not permitted to find that her gap in psychological treatment between May 2007 and May 2010 would contraindicate the serious limitations imposed by Finder and Dr. Hutchins. (ECF No. 15 at 25). Logerman asserts that "[t]he ALJ was not free to make his own medical conclusion." (Id.) In support of this statement, Logerman argues that "[t]he law in this circuit has been for many years that a finding of RFC must be supported by some medical evidence." (Id. (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1024-25 (8th Cir. 2002); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir.2001)). In addition, Logerman cites to Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) for the proposition that Logerman's sporadic mental treatment does not necessarily mean that she was not mentally ill, but may be indicative of Plaintiff's conditions of major depressive disorder and generalized anxiety disorder. (ECF No. 15 at 25-26). Logerman also argues that the ALJ incorrectly concluded that her activates of sweeping, vacuuming, and doing laundry were inconsistent with a finding of mental disability. (ECF No. 15 at 26). Finally, Logerman asserts that "[t]he ALJ failed to point to any psychiatric or psychological professional who supported his conclusion regarding Plaintiff's activities." (ECF No. 15 at 27).

In response, the Commissioner argues that the ALJ properly found that Logerman retained the ability to perform light work as defined in the regulations and with some additional

16

restrictions. (ECF No. 22 at 4). The Commissioner contends that this RFC was properly determined based upon all of the credible medical evidence. Contrary to Logerman's brief, the Commissioner notes that the RFC "is not based solely on medical opinion evidence; rather it is based on all the credible medical evidence of record." ECF No. 22 at 3 (citing 20 C.F.R. §§404.1545(a), 416.945(a)). The Commissioner contends that the ALJ performed a detailed credibility analysis and carefully considered Logerman's testimony and the medical records. (ECF No. 22 at 5). The ALJ noted Logerman's activities of daily living as well as her sporadic mental health care in determining that Logerman's impairments were not as severe as alleged. (ECF No. 22 at 6-8). The Commissioner also took issue with Logerman's argument that her sporadic treatment could have been the result of her mental impairment, as in Pate-Fires v. Astrue. The Commissioner stated that, unlike in Pates-Fires, Logerman was "compliant with her antidepressant medications and there is no evidence to the contrary" and Logerman received minimal mental health treatment. (ECF No. 22 at 8-9).

The Court holds that the ALJ considered all of the evidence, including the medical evidence, in determining the RFC and the decision to deny Logerman's claim was supported by substantial evidence on the record as a whole. RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545, 416.945. The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis. SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th

17

Cir.1995)). The Court recognizes that "[a]lthough the ALJ bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence, a claimant's [RFC] is a medical question." Hutsell, 259 F.3d at 711 (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001)); Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002)(quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.2000))("determination of residual functional capacity is based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations'"). Therefore, an ALJ is "required to consider at least some supporting evidence from a [medical] professional." Lauer, 245 F.3d at 704. However, contrary to Logerman's position, this does not mean that the ALJ must rely on a specific medical opinion for it to be supported by substantial medical evidence. "Medical testimony is relevant in determining precisely what claimant's physical impediments are, but it is not conclusive as to the ultimate question concerning whether the claimant's injuries are so severe that he is prevented from doing productive work." Nelson v. Sullivan, 946 F.2d 1314, 1316–17 (8th Cir.1991). Rather, an RFC determination will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir.2006); 20 C.F.R. §§404.1545(a), 416.945(a). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)(citing 20 C.F.R. § 416.927(c)(3)). "But an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber, 22 F.3d at 189 (citing 20 C.F.R. § 416.927(c)(4)).

The Court finds that the ALJ's findings were sufficiently supported in the record and by competent medical evidence. First, the ALJ properly addressed Logerman's credibility. See

Pearsall, 274 F.3d at 1218 ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility."); Wildman v. Astrue, 596, 959, 968 (8th Cir. 2010)("[W]e will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."). The ALJ discussed a number of inconsistencies in the record. For example, although Logerman alleged significant symptoms and limitations due to her back impairment, the clinical and objective findings failed to support that severe of a limitation. (Tr. 20-24). Logerman began reporting lower back and hip pain in approximately January 2008. (Tr. 20). The ALJ pointed out that the diagnostic images showed "mild" degeneration of the bilateral hips and straightening of the lumbar lordosis. (Tr. 20). Follow-up examinations by an orthopedist in 2008 revealed that Logerman had developed some tenderness and reduced range of motion in the lumbar spine, as well as straight leg raises, but Logerman had no sensory deficits, muscle atrophy, or gait abnormalities. (Tr. 21). Further, the ALJ noted that Logerman's MRI in 2009 showed no signs of significant deterioration from 2008, other than a bulging disk in her lumbar spine. Yet, despite her bulging disk, Logerman chose not to have surgery until March 2011. Although Logerman claims that she had only a couple weeks of relief after her microdiskectomy at L5-S1, the treatment notes show that Logerman experienced significant pain relief for several months after the surgery. Finally, the ALJ pointed out that, although Logerman has recently reported back pain, this pain is likely the result of caring for her mother and aunt and the resulting increased physical activity. (Tr. 21; see also Tr. 492).

Additionally, Logerman's daily activities, in conjunction with other record evidence, support the ALJ's finding that Logerman is capable of performing light work, as provided by the ALJ. See Brown v. Astrue, 611 F.3d 941, 955-56 (8th Cir. 2010). "[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's

19

credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). The ALJ noted that Logerman admitted that she performed chores around the house, including sweeping and vacuuming, as well as doing the laundry daily. (Tr. 296). She drives up to twenty miles at least four times per week to see her boyfriend. (Tr. 298). She sits and watches her children's ballgames, which presumably last at least a couple of hours. (Tr. 55). She reported to her doctors that she sometimes gardens and plays videogames. (Tr. 297). She reads books and newspapers and texts her mother and aunt. (Tr. 51, 297). She also cares for her aunt and mother. (Tr. 492). These physical activities do not support her contention that has restrictions beyond the limitations outlined by the ALJ.

Based upon these medical records and Logerman's admitted activities of daily living, the Court finds that the ALJ properly accounted for Logerman's physical impairments with the RFC that included a light work reduction and additional restrictions, such as limited walking and alternating between sitting and standing at will.[3] See Bryant v. Colvin, No. 13-2351 (8th Cir. Sept. 25, 2014) (finding that the ALJ did not entirely discount the claimant's allegations of pain where the RFC was limited to two hours of standing per workday, occasional lifting of ten pounds, and frequent lifting of less than ten pounds).

Likewise, the medical records indicate that Logerman sought limited treatment, despite her supposed severe mental impairment. The ALJ determined that although Logerman has been diagnosed with various affective and anxiety disorders, including major depressive disorder, generalized anxiety disorder, panic disorder and post-traumatic stress disorder, Logerman's

---

[3] As previously discussed, the ALJ limited Logerman to lifting and carrying twenty pounds occasionally and ten pounds frequently; walking no more than two hours out of an eight-hour workday; must be able to alternate between sitting and standing at will; climbing ramps or stairs for only up to two hours out of an eight-hour workday, but never ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; frequently handling and reaching; and must avoid work environments containing hazards such as dangerous machinery or unprotected heights.

20

failure to seek regular, frequent treatment undermined her credibility that she suffers from a severe impairment. (Tr. 22). For example, the ALJ noted that Logerman began experiencing symptoms in May 2007 but failed to seek further psychiatric treatment until May 2010. (Tr. 22). Even after Logerman established psychiatric treatment in 2010, Logerman only met with her mental health providers on a sporadic basis, often going several months between appointments. (Tr. 22). Thus, notwithstanding Dr. Hutchen's consultative examination and Finder's opinion,[4] which was arranged by Logerman's counsel, the record supports the ALJ's determination that she does not suffer from a severe mental impairment. The Court also agrees that Plaintiff's reliance on Pates-Fires is misplaced. In Pates-Fires, the plaintiff was a noncompliant patient who suffered from schizophrenia. In contrast, Logerman was "compliant with her antidepressant medications and there is no evidence to the contrary" and Logerman sought minimal mental health treatment. As a result, the Court believes that Logerman's limited mental health treatment is relevant to the ALJ's finding that her mental health symptoms were not as severe as alleged.

The Court finds that the ALJ properly accounted for Logerman's mental deficiencies with the finding that Logerman could understand, remember, and carry out non-detailed, two-to-three step directions; could perform repetitive tasks in a routine work setting involving few changes, where interaction with supervisors and coworkers would occur on no more than an occasional basis, and where work is performed in a nonpublic setting; and should not perform work where she is required to communicate with the public on behalf of the employer.

The ALJ considered and analyzed Logerman's physical and mental impairments as outlined in the medical and factual record in determining Logerman's RFC. The Court, therefore, finds that the ALJ's decision as it relates to Logerman's RFC is supported by

---

[4] Notably, Finder never provided any opinion as to Logerman's ability to work. Rather, his entire report consists primarily of a regurgitation of Logerman's self-reported history.

substantial medical evidence in the record as a whole. See Bryant v. Colvin, No. 13-2351 (8th Cir. Sept. 25, 2014)(affirming the district court's decision that, despite claimant's subjective complaints of pain and other limitations, the "substantial evidence in the record as a whole supports the ALJ's credibility assessment, his hypothetical to the VE, and his ultimate finding that [claimant] was not disabled during the period in question.").

## VI.    Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate Judgment will accompany this Order.

Dated this 29th day of September, 2014.

John A. Ross

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE